# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7496 | **DATE** | 2/27/2001 |
| **CASE TITLE** | GUNTER vs. NOVOPHARM USA INC et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Pursuant to Memorandum Opinion and Order entered this date, defendants' motions for summary judgment are granted as to the second amended complaint in its entirety and granted as to the issue of liability in Count I of defendants' counterclaim; and denied as to the issue of damages in Count I and denied as to Count II as to the counterclaim. Trial date of May 7, 2001 shall stand. All other previously set dates shall stand. Status hearing for a report on settlement is set for March 8, 2001 at 9:00 am.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | FEB 28 2001 | | |
| | Docketing to mail notices. | | date docketed | | 67 |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 2/27/2001 | | |
| JS | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | JS mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT J. GUNTER                          )
                                          )
                Plaintiff,                )
                                          )
        v.                                )
                                          )
NOVOPHARM USA, INC., a Delaware           )      No. 99 C 7496
corporation; NOVOPHARM LTD., a Canadian   )
Company; LESLIE L. DAN, a Canadian citizen, )
                                          )
                Defendants.               )
                                          )

## MEMORANDUM OPINION AND ORDER

DOCKETED

FEB 28 2001

JAMES F. HOLDERMAN, District Judge:

On November 17, 1999, plaintiff Robert J. Gunter ("Gunter") filed this action against

defendants Novopharm USA, Inc. ("USA, Inc."), Novopharm Ltd., and Leslie L. Dan ("Dan")

seeking benefits under a Supplemental Employee Benefit Agreement ("SEBA"), compensatory and

punitive damages, as well as attorney fees and costs. On April 21, 2000, defendant USA, Inc. filed

a two-count counterclaim against Gunter. Count I of the counterclaim seeks compensatory and

punitive damages, as well as attorney fees and costs for breach of fiduciary duty. Count II of the

counterclaim seeks compensatory and punitive damages as well as attorney fees and costs for fraud

under Illinois law. On October 12, 2000, Gunter filed a two-count "Second Amended Complaint."

Count I of the second amended complaint seeks recovery against defendants pursuant to

§502(a)(1)(B) of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(a)(1)(B). Count II of the second amended complaint seeks recovery under a theory of unlawful discharge pursuant to Illinois common law.

On October 27, 2000, defendant USA, Inc. and defendants Novopharm, Ltd. and Dan filed separate motions to dismiss the second amended complaint. While these motions were still pending, on January 2, 2001, defendant USA, Inc. and defendants Novopharm Ltd. and Dan filed separate motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure[1]. In conjunction with the separate motions for summary judgment, supporting documents, affidavits, statements, responses and replies in support and in opposition have been filed with this court.

Pursuant to the last sentence of Federal Rule of Civil Procedure 12(b), the pending motions to dismiss filed on October 27, 2000, will be converted to motions for summary judgment and considered in conjunction with the pending motions for summary judgment filed on January 2, 2001. Having considered all of the evidence in the record, defendants' motions for summary judgment are GRANTED as to the second amended complaint in its entirety, GRANTED on this issue of liability in Count I of defendants' counterclaim and DENIED as to Count II of defendants' counterclaim.

---

[1] Since filing separate motions to dismiss and motions for summary judgment, defendants have agreed to proceed jointly in this matter. Both motions to dismiss and both motions for summary judgment assert similar grounds. Since all parties have had adequate opportunity to address the issues presented in both motions to dismiss and both motions for summary judgment this court will consolidate, consider, and rule on all the motions submitted by defendants' jointly as motions for summary judgment pursuant to the last sentence of Federal Rule of Civil Procedure 12(b). See Edward Gray Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 94 F.3d 363, 367 (7th Cir. 1996).

## STATEMENT OF FACTS[2]

USA, Inc., is a Delaware corporation with its principal place of business in the Northern District of Illinois. Novopharm, Ltd., is a Canadian company and the corporate parent of USA, Inc. Leslie Dan is a Canadian citizen and from 1989 through 1998, was Novopharm, Ltd.'s and USA, Inc.'s sole chairman, director, and shareholder.

Gunter was first employed by USA, Inc. (f/k/a Novopharm, Inc.) in 1989, and Dan, as director and chairman, was responsible for determining Gunter's salary. Throughout the course of Gunter's employment with USA, Inc., Gunter corresponded directly with Dan regarding his compensation, often requesting increases in salary, bonuses as well as performance reviews. Gunter's duties and compensation as President of USA, Inc. were set out in several letters signed by Dan and sent to Gunter. Dan stated to Gunter in one letter dated July 28, 1989, that Gunter was authorized to sign all necessary documents involved in the normal work-day situations on behalf of Novopharm, Inc., US Subsidiary of Novopharm, Ltd. In a second letter dated November 3, 1989, Dan stated that Gunter's title was President of Novopharm Inc., U.S.A. (n/k/a Novopharm USA, Inc.), a subsidiary of Novopharm Ltd. This November 3rd letter also detailed various aspects of Gunter's compensation package including his base salary, guaranteed bonuses, incentive program, car allowance, insurance plan, retirement plan, and executive stock option plan. Another letter between Dan and Gunter dated March 8, 1993, addressed Gunter's responsibilities as President of USA, Inc. This March 8th letter authorized Gunter as President and Chief Operating Officer of

---

[2]The following facts are undisputed and are taken from the defendants' and plaintiff's submissions pursuant to Local Rules 56.1(a) and (b), as well as any undisputed facts submitted regarding the earlier filed motions to dismiss.

3

Novopharm, Inc. to execute all necessary documents involved in the business management of Novopharm, Inc. including but not limited to facility leases, business contracts, employee benefit programs, business licences, employment agreements and other operational requirements as necessary. The March 8th letter requested that all executed major business documents be forwarded to Dan's office so that Dan could remain properly informed.

On or about September 28, 1992, Gunter executed, as President of USA, Inc., a written document entitled "Novopharm USA, Inc. Supplemental Employee Benefit Agreement," ("SEBA"). The SEBA was between Gunter and USA, Inc. Gunter negotiated and signed the SEBA both for himself as the employee of USA, Inc., and on behalf of USA, Inc., as its president authorizing the execution of the SEBA.

> Section A, Paragraph 3 of the SEBA provides:
> If the Employee [Gunter] remains in the continuous employ of the Company, he shall retire from active employment with the company on February 10, 1995 unless by action of the company or by mutual assent, his period of active employment shall be shortened or extended.

> Section B, Paragraph 1 of the SEBA provides:
> Due to the value which the Company places upon the Employee's [Gunter's] continued employment the Company shall purchase a life insurance policy to protect itself in the event of a loss by death or termination of the Employee [Gunter]. The Company shall be the sole applicant owner and beneficiary of said policy.

> Section E, Paragraph 1 of the SEBA provides:
> Upon the retirement of the Employee [Gunter], the Company shall pay to the employee [Gunter] a total amount equal to five (5) times the Employee's [Gunter's] Gross Annual Salary at the time of the retirement of the Employee [Gunter]. This amount shall be paid to the Employee [Gunter] in equal monthly installments beginning the first day of the month following the month of the retirement of the Employee [Gunter] and continuing on the first day of every month thereafter for a total of one hundred twenty (120) months.

> Section F, Paragraph 2 of the SEBA provides:
> Upon the termination of Employee's [Gunter's] employment for any reason, the Employee [Gunter] shall have the option to purchase all policies of insurance which the Company has

purchased which insures the Employee [Gunter] or the Employee's [Gunter's] dependants. The purchase price of the policy(s) will be the net surrender value of the policy(s).

Section H, of the SEBA provides:
The Company agrees that upon a change of management excepting retirement, such that the Employee [Gunter] is no longer active in the capacity of President of the Company, the Company shall immediately transfer ownership of all policies of insurance which the Company has purchased which insures [sic] the Employee [Gunter] or the Employee's [Gunter's] dependants at no cost to the Employee [Gunter] .

In consideration of the USA, Inc.'s obligations under the SEBA, Gunter was willing to continue his employment with USA, Inc.'s and was required to remain in the employ of USA, Inc. until his retirement.

Pursuant to the SEBA, Gunter on behalf of USA, Inc., entered into two insurance policies for himself. The first of these policies from Traveler's Insurance called for Gunter to receive $4,375 per month in "deferred compensation" for a period of 10 years following his retirement if he remained in USA, Inc.'s employ until February 10, 2000. The second of these policies with Prudential Life Insurance had an annual premium of approximately $28,000 to insure Gunter's life.

In a letter dated November 10, 1998, Dan terminated Gunter as President of USA, Inc., effective immediately for breaches of confidence and trust. Gunter filed this lawsuit a year later.

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor.

5

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1996). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553 (1986). There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249, 106 S. Ct. at 2511.

## ANALYSIS

Defendants' argue that their motions for summary judgment should be granted because:

(1) the SEBA does not constitute a plan governed by ERISA;
(2) the SEBA is not a binding contract, enforceable against USA, Inc.;
(3) Gunter's claim of unlawful discharge under Illinois law is preempted by ERISA;
(4) Gunter breached his fiduciary duty owed to USA, Inc., Novopharm, Ltd., and Dan;
(5) Gunter's actions surrounding the execution and carrying out of the SEBA constitutes fraud under Illinois law.

The court will address each of these arguments in turn.

I. Determination of whether SEBA qualifies as a "plan" under ERISA

In Count I of the second amended complaint, Gunter seeks recovery under the SEBA pursuant to section 502(a)(1)(B) of ERISA, 29 U.S.C. §1132(a)(1)(b). Defendants argue, however, that Gunter cannot recover any benefits under SEBA pursuant to ERISA because the SEBA as it was created and as it is written does not fall under the purview of ERISA.

In assessing whether the SEBA qualifies as a plan under ERISA, this court first begins with

6

the text of the statute. ERISA section 502(a)(1)(B) states that "[a] civil action may be brought--(1) by a participant or beneficiary--(B) to recover benefits due to him under the terms of his plan [or] to enforce his rights under the terms of the plan...." 29 U.S.C. § 1132(a)(1)(B). Section 3(3), in turn, states that "[a] 'plan' means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both...." 29 U.S.C. § 1002(3). An "employee welfare benefit plan" is "any plan, fund, or program ... established or maintained by an employer ... for the purpose of providing ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1). An "employee pension benefit plan" is "any plan, fund, or program ... established or maintained by an employer ... that ... provides retirement income to employees, or ... results in a deferral of income." 29 U.S.C. § 1002(2)(A).

With the statute in mind, case precedent dictates that the determination of whether the SEBA in this case is governed by ERISA turns on whether the SEBA requires an ongoing administrative scheme and on whether the terms of the SEBA are reasonably ascertainable or need managerial supervision. See Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 12, 107 S.Ct. 2211, 2217-18 (1987); see also Cvelbar v. CBI Illinois Inc., 106 F.3d 1368, 1374 (7th Cir. 1997) *abrogated on other grounds not relevant here by* International Union of Operating Engineers, Local 150, AFL-CIO v. Rabine, 161 F.3d 427 (7th Cir. 1998).

To be sure, a contract between one employee and an employer can be an employee benefit plan governed by ERISA. Cvelbar, 106 F.3d at 1376. The plain language of ERISA in no way excludes from coverage those situations in which only one employee is extended benefits. Id. The difference between a "plan" covered by ERISA, such as the plan in Cvelbar, and a plan not covered by ERISA as in Fort Halifax is a matter of degree. Id. at 1375. Therefore, the judicial task in

7

distinguishing between individual benefit contracts and employee benefits plans is a task of line-drawing. Id.

In Fort Halifax, the United States Supreme Court considered a Maine statute which required employers who terminated or relocated their operations to pay a lump-sum payment to their employees. The Court held that the Maine statute did not establish, nor did the statute require employers to maintain, an ERISA plan:

> The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well never have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

482 U.S. at 12, 107 S.Ct. at 2218 (footnote omitted). The lump-sum nature of the Maine obligation weighed heavily in the Court's analysis because an ongoing administrative program typically is required in instances where there are "ongoing benefits to be paid," Id. at 14-15 n. 9, 107 S.Ct. at 2219 n. 9, and where there is a "regularity of payment," Id. at 18 n. 12, 107 S.Ct. at 2221 n. 12.

In Cvelbar, the United States Court of Appeals for the Seventh Circuit considered a contract between a single employee and the employer. In determining whether the contract at issue was a plan governed by ERISA, the Seventh Circuit stated:

> The pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits. Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme; rather, an employer's need to create an administrative system may arise where the

8

employer, to determine the employee's eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria.

106 F.3d at 1375 (quoting Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 257 (8th Cir.1994)).

In this case, the SEBA between Gunter and USA, Inc. provides the following benefits to Gunter: (a) a death benefit to his designated beneficiaries should he die while still actively employed by USA, Inc., (b) a retirement benefit, based on his "Gross Annual Salary" at the time of retirement payable over 120 months, (c) upon termination of employment for any reason, the right to purchase any insurance policies on his life by paying the "net surrender value" of each such policy, and (d) the transfer of any such policies, at no cost to him, in the event Gunter ceases to be President of USA, Inc., while still employed with USA, Inc. None of these benefits requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits. In addition, Gunter's eligibility and the amount of benefits owed Gunter under the SEBA is automatic. There is no need to determine Gunter's eligibility, nor is there a need to determine the level of Gunter's benefits. Under the SEBA, upon Gunter's retirement, Gunter is to be paid a lump sum of five times his "Gross Annual Salary," that number is easily ascertained and is triggered by a single event. In many ways the SEBA in this case is similar to the plan analyzed in Fort Halifax. The calculation and payments of the benefits under the SEBA are a purely clerical tasks which occur on a one-time basis, require little computation no managerial discretion. Under the SEBA, the amount of the benefits owed to Gunter, the timing of the payments, and the duration of the payments are all specifically prescribed.

The one major difference between the SEBA in this case and the plan in Fort Halifax is the number of payments to be paid to Gunter. In Fort Halifax, the Maine statute called for a single

payment, whereas the SEBA in this case calls for 120 payments to be paid to Gunter. The mere fact, however, that the SEBA calls for more than one fixed monthly payment to Gunter does not covert the SEBA into an ERISA plan. See Delaye v. Agripac, Inc., 39 F.3d 235 (9th Cir.1994) (holding that contract calling for the continuation of pay at one of two set formulas depending upon reason for termination and for the continuation of insurance and vacation benefits was not a plan because sending a single employee a check every month and continuing to pay his insurance benefits for a time specified in the contract does not rise to the level of an ongoing scheme).

Comparing the SEBA in this case to the plan analyzed in Cvelbar, in Cvelbar the severance benefits were to be provided for some years following termination, similar to the SEBA in this case. 106 F.3d at 1377. Additionally, the benefits in Cvelbar were triggered by the single event of Mr. Cvelbar's termination. Id. However, the benefits extended to Cvelbar are not similar to the "one-time, lump-sum payment" considered in Fort Halifax, 482 U.S. at 12, 107 S.Ct. at 2218, nor are they similar to the 120 fixed monthly payments in this case.

In Cvelbar, the defendant-employer assumed a "responsibility to pay benefits on a regular basis" and faced "periodic demands on its assets that create a need for financial coordination and control." 106 F3d. at 1377. Additionally, during the period after termination, the plan in Cvelbar required the employer to process medical claims, and pay medical benefits to Cvelbar and his dependents, as well as make requisite monthly payments. Moreover, the contract in Cvelbar placed on the employer an ongoing responsibility to review the contract annually, while Mr. Cvelbar was still employed, in order to decide whether to extend the terms of plan for additional years. Id. The difference between the plan in Cvelbar and the SEBA in this case is that the employer in Cvelbar undertook an ongoing responsibility and managerial discretion in administering the benefits under

the plan. In Cvelbar, the employer had to do more than merely "write a check," and at no point were the amounts of benefits to be paid to Cvelbar easily ascertainable.

The additional, ongoing, responsibility and managerial discretion present in Cvelbar differientiates the plan in Cvelbar from the statute considered in Fort Halifax and from the SEBA considered in this case. Arguably in this case, USA, Inc. has to do a little more than write a single check to carry out its obligations under the SEBA. The undisputed evidence reveals that, under the SEBA, USA, Inc. would have to write 120 checks. Despite, however, the 119 additional checks facing USA, Inc., in this case, the SEBA contract here is still closer to the plan in Fort Halifax than it is to the plan in Cvelbar. Accordingly, this court finds that the SEBA is a contract between Gunter and USA, Inc., and not a "plan" as defined by ERISA. As a result, the SEBA in this case falls outside the purview of ERISA. As a result, summary judgment on Count I of the second amended complaint in favor of the defendants' is necessary as a matter of law.

II. The enforceability of the SEBA against USA, Inc.

Defendants argue that summary judgment on Count I in their favor is necessary because the SEBA, as a contract, is not a valid agreement enforceable against any of the defendants because Gunter lacked the authority to execute the SEBA. In response, Gunter argues that Dan and Novopharm, Ltd. must have known about the SEBA because both Dan and Novopharm, Ltd. had access to all of USA, Inc. files. Gunter further argues that because Price Waterhouse Coopers did the taxes for both Ltd., and USA, Inc., the existence of the SEBA had to have been known through the tax information provided by Price Waterhouse Coopers to Dan and Novopharm, Ltd. Finally, Gunter argues that since Randal L. Wimmer, the Assistant Secretary/Treasurer of USA, Inc., signed the tax returns for USA, Inc. and signed the SEBA and since Wimmer reports to the

11

Secretary/Treasurer of USA, Inc., Ed McCormack, who also was the Vice-President of Finance for Ltd., then Dan, and Novopharm, Ltd. must have known about the SEBA through Wimmer and McCormack.

Gunter's arguments fails to establish actual notice to Dan, or to Novopharm, Ltd. as to the existence of the SEBA. More importantly, however, Gunter fails to present any evidence to create a genuine issue of material fact that he had the authority to execute such a SEBA on behalf of himself and on behalf of USA, Inc. As a result, this court finds that the SEBA as a contract is not a valid agreement enforceable against any of the defendants. On this basis as well as the basis in section I of this opinion, suummary judgment in favor of the defendants on Count I of the second amended complaint is necessary as a matter of law.

A.    Conflict of Laws

The established rule in conflicts law provides that "[t]he corporate law of the state of incorporation is controlling with respect to the fiduciary duties of its directors as well as other internal corporate affairs." Treco, Inc. v. Land of Lincoln Sav. and Loan, 749 F.2d 374, 377 (7th Cir.1984). The internal affairs doctrine is a conflict of laws principle which recognizes that only one state should have the authority to regulate a corporation's internal affairs-- matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders. See Edgar v. MITE Corp., 457 U.S. 624, 645, 102 S.Ct. 2629, 2642 (1982).

Gunter argues, however, that Illinois law should govern because the contract in question was executed in Illinois and because language in the SEBA states that Illinois law should govern. If this case centered solely on what benefits the defendant's owed Gunter under the contract in question then Gunter would be correct in his argument. The threshold issues in this case, however, deal with

whether Gunter had the proper authority to enter into the SEBA and whether Gunter breached a fiduciary duty owed to USA, Inc., Novopharm, Ltd., and Dan when Gunter entered into the SEBA. Since both of these issues center around the internal affairs of a corporation, the law of Delaware, the place where USA, Inc. is incorporated, applies.

      B.     <u>Gunter lacked the authority as President of USA, Inc. to enter into a SEBA on behalf of USA, Inc.</u>

A corporation is a creature of legal fiction, and must "act" through its officers, directors or other agents. <u>Joseph Greenspon's Sons Iron & Steel Co. v. Pecos Valley Gas Co.</u>, 156 A. 350, 351, 34 Del. 567, 570 (Del. Super. 1931). As a result, a corporation is bound by its agent's acts, if the acts of the agent were performed with the implied, express or apparent scope of authority granted by the corporation, unless the agent acted for his own benefit without the corporation's ratification. <u>Cede & Co. Technicolor, Inc.</u>, 634 A.2d 345, 367 (Del. 1993)(defining a breach of fiduciary duty). Evidence of a statement by an agent concerning the existence or the extent of his authority is not admissible against a corporation to prove the existence or to prove the extent of authority, unless it appears by other evidence that the statement by the agent was within the authority of the agent. <u>See State of Delaware, for Use of General Crushed Stone Co. v. Massachusetts Bonding & Insurance Co.</u>, 49 F.Supp. 467, 471 (D.C.Del. 1943).

The president of a private corporation is presumed to have, by virtue of his presidential office, certain limited powers to conduct the usual and ordinary business of the corporation. 156 A. at 351, 34 Del. at 570. Accordingly, the president of a corporation may perform all the acts of an ordinary nature which by usage or necessity are incident to the daily running of the corporation, without special authority or explicitly delegated power. <u>Id</u>. These presumed powers include, but

are not necessarily limited to the ability to enter into a contract which binds the corporation in matters arising from and concerning the usual course of the corporation's business.  Id.   The authority, however, to enter into contracts of an extraordinary nature, outside the regular custom and usage of business, must be express and cannot arise by implication. 156 A. at 352, 34 Del. at 571.

In this case, it is undisputed that a series of four letters between Dan to Gunter outlined Gunter's responsibilities as President of USA, Inc.  Specifically, the letter dated March 8th to Gunter authorized Gunter as President and Chief Operating Officer to execute all necessary documents involved in the business management of Novopharm, Inc., including but not limited to facility leases, business contracts, employee benefits programs, business licences, employment agreements and other operational requirements as necessary.  No where in the record does it state that Gunter had the authority to execute a contract on behalf of USA, Inc. which increases his own compensation.  Furthermore, the undisputed evidence in this case reveals that as a matter of practice Gunter always spoke directly to Dan concerning his compensation as President of USA, Inc.  There is absolutely no evidence on the record to create an issue of material fact that entering the SEBA was a part of Gunter's duties pursuant to the usual and ordinary business of USA, Inc. and there is absolutely no evidence in the record to create an issue of material fact that Dan granted to Gunter the express or implied authority to enter into the SEBA.

Unsurprisingly, Gunter makes no argument that he had any authority to execute the SEBA, express or otherwise.  Gunter instead argues, in essence, that he left a sufficient paper trail such that anyone in Novopharm, Ltd. or that Dan himself could have found out about the existence of the SEBA.  Additionally, Gunter argues that because a corporate officer of USA, Inc., signed the SEBA then knowledge of the SEBA is thereby imputed to the parent corporation and to Dan as director of

14

both corporations. Gunter's "paper trail" argument is without merit because this argument wrongly assumes that either Novopharm, Ltd. or Dan knew to look for the SEBA. Moreover, this "paper trail" argument does not address Gunter's authority to enter into the SEBA. Similarly, the "constructive notice" argument is also without merit again because this argument does not address the issue of whether Gunter had the authority to enter into the SEBA. Drawing all reasonable inferences in favor of Gunter, there is no dispute of material fact that the execution of the SEBA was outside of Gunter's duties and responsibilities as President of USA, Inc., and not concerning the usual and ordinary business of USA, Inc. In addition, there is no dispute of material fact that Gunter lacked the authority, express, implicit, or otherwise to execute the SEBA. Therefore, this court finds that the SEBA executed between Gunter, and USA, Inc. is not a valid agreement and therefore unenforceable against any of the defendants. Accordingly, summary judgment on Count I of the second amended complaint in favor of the defendants is granted.

IV.     Guther's Unlawful Discharge Claim

In Count II of the second amended complaint, Gunter alleges that defendants discharged him for the sole purpose of interfering with his rights under the SEBA and to coerce him not to assert his rights under the SEBA. There are two reasons why summary judgment on Count II if favor of the defendants is necessary as a matter of law. If the SEBA is a plan governed by ERISA, then Count II is preempted by ERISA. Or, as already discussed earlier in this opinion, if the SEBA is not a plan governed by ERISA, then Count II is still nonetheless without merit because Gunter fails to provide sufficient evidence in the record to establish a prime facie case of unlawful discharge.

A.     Guther's claim of unlawful discharge under Illinois law is preempted by ERISA

This court finds that if the SEBA is a plan governed by ERISA then ERISA preempts

15

Gunter's claims of unlawful discharge. See Tolle v. Carroll Touch, Inc., 977 F.2d 1129, 1137 (7th Cir. 1992). ERISA § 510 provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. . .

29 U.S.C. § 1140. Gunter's alleges in Count II of the second amended complaint that the defendants terminated him in order to avoid paying him benefits to which he was or would have become entitled to receive under the SEBA. The allegations in Count II, however, are nothing more than a restatement of Count I of the second amended complaint where Gunter alleges that the defendants were denying his rights under the SEBA pursuant to ERISA. Gunter cannot turn a Section 510 ERISA claim into a state claim simply changing the wording of his allegations. See Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 111 S.Ct. 478 (1990). ERISA preempts Gunter's wrongful discharge claim because Gunter's allegations of unlawful discharge are based on an alleged violation of the SEBA, which for purposes of this section only is a assumed governed by ERISA.

Since, however, this court has already found that the SEBA in this case is not a plan under ERISA, see Section I of this opinion, it follows that ERISA then cannot preempt Count II of the second amended complaint. Summary judgment in favor of the defendants on Count II is still necessary as a matter of law, however, because Gunter fails to establish a prima facie case of unlawful discharge under Illinois law. Upon further review of the record, drawing all reasonable inferences in favor of Gunter, there is insufficient evidence to establish a genuine issue of material fact of unlawful discharge.

In Count II of the second amended complaint, Gunter does not site any Illinois statute that

the defendants violated in terminating his employment, nor does Gunter allege any breach of contract under Count II. Gunter simply alleges that "defendants' action of discharging Gunter violates Illinois law and so shocks the conscious and public policy as a retaliatory act as to justify the imposition of punitive damages." (Second Amended Complaint ¶38). In his memorandum in opposition to summary judgment, Gunter argues the allegations in Count II amount "to a kind of shifting of burdens which the Supreme Court allowed through *McDonald* [sic] *Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 2nd 688 (1973), and its progeny." The United States Supreme Court has set out a three-part analysis in considering employment discrimination claims. See <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817 (1973). The Supreme Court of Illinois adopted this approach in analyzing employment discrimination claims in <u>Zaderaka v. Human Rights Comm'n</u>, 131 Ill.2d 172, 178- 79, N.E.2d 684, 687-88. (1989). The first prong of the analysis is whether a prima facie case of discrimination has been made by the plaintiff-employee. <u>Zaderaka</u>, 131 Ill.2d at 178-79, 137 Ill.Dec. at 34, 545 N.E.2d at 687. The second prong shifts the burden onto the defendant-employer to provide legitimate nondiscriminatory reasons for its decisions presumed in the first prong to be discriminatory, and the third prong, if reached, requires the plaintiff to prove that the employer's proffered reasons are actually a pretext for discrimination. <u>Id</u>. In this case, Gunter fails to provide sufficient evidence in the record to establish a prima facie case of unlawful discharge and fails to provide sufficient evidence to refute defendants' legitimate nondiscriminatory reasons for his termination.

To establish a prima facie case for retaliation, Gunter must show that (1) he engaged in statutorily protected expression, (2) he suffered an adverse employment action, and (3) there is a casual link between the protected expression and the adverse action. See <u>generally</u> <u>Dey v. Colt</u>

Constr. & Dev. Co., 28 F.3d 1446, 1457 (7th Cir. 1994)(dealing with Title VII); American Federation of State, County and Mun. Employees, Council 31, AFL-CIO v. Illinois State Labor Relations Bd., 175 Ill.App.3d 191, 529 N.E.2d 773 (1st Dist. 1988)(dealing with union activities). In this case, Gunter has not carried his evidentiary burden in establishing a genuine dispute of material fact as to his prima facie case of retaliation. Gunter provides no evidence in the record to establish a genuine issue of material fact that his execution of a self-benefitting contract which increased his over all compensation was a stautoriliy protection expression. Gunter stands only on his bare allegations in the second amended complaint that he was discharged by the defendants in order to keep him from attainment of his rights under the SEBA. As a matter of law, bare allegations alone are insufficient to establish a genuine issue of material fact. Fed. R. Civ. P. 56(e).

In addition to having failed to establish a prima facie case of unlawful discharge, Gunter fails to rebut the defendants' legitimate, nondiscriminatory reasons for his termination. The defendants' in their motion for summary judgment state that Gunter was terminated because he breached a duty of trust, and because he breached his fiduciary duty. Gunter does not provide sufficient evidence in the record to refute defendants' reasons nor does Gunter present any evidence that defendants' reasons are a pretext for discrimination. Accordingly, summary judgment on Count II in favor of the defendants is necessary as a matter of law, Gunter having failed to establish a prima facie case of unlawful discharge and having failed to provide sufficient evidence on the record to refute defendants' legitimate, nondiscriminatory reasons for his termination.

V.    USA, Inc.'s Counterclaims:  A Prima Facie case of Breach of Fiduciary Duty

Under Delaware law, it is well established that the directors and corporate officers of a corporation have a fiduciary relationship with the corporation they serve and the stockholders of the

18

corporation. <u>Jackson Nat. Life Ins. Co. v. Kennedy</u>, 741 A.2d 377, 386 (Del.Ch. 1999). Accordingly, Gunter as President of USA, Inc. owed a fiduciary duty to USA, Inc., Novopharm, Ltd., and Dan as the sole shareholder under Delaware law.

The Delaware Supreme Court describes the fiduciary duty of a corporate officer as a "triad" of duties including a duty of due care, good faith and loyalty. <u>See</u> <u>Cede</u>, 634 A.2d at 367. The Delaware Supreme Court explains that the business judgment rule is an extension of the fiduciary obligation of corporate officers, and directors. The Delaware Supreme Court states that the business judgment rules operates to preclude a court from imposing itself unreasonably into the business and affairs of a corporation. <u>Id</u>. The Delaware Supreme Court states:

> The [business judgment] rule operates as both a procedural guide for litigants and a substantive rule of law. As a rule of evidence, it creates a "presumption that in making a business decision, the directors of a corporation acted on an informed basis [i.e., with due care], in good faith and in the honest belief that the action taken was in the best interest of the company."

<u>Id</u>. at 360 (quoting <u>Aronson v. Lewis</u>, 473 A.2d 805, 812 (Del. Supr.1984)). The business judgment rule posits a powerful presumption in favor of actions taken by the directors. In the absence of any evidence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment," a decision made by a loyal and informed board will not be overturned by the courts unless the decision cannot be attributed to any rational business purpose. <u>Id</u>. at 361 (quoting <u>Grobow v. Perot</u>, 539 A.2d 180, 187 (Del.Supr.1988)).

Thus, a litigant challenging a decision by a corporate officer has the burden at the outset to rebut the rule's presumption by providing evidence that the officer, in reaching their challenged decision, breached any one of the triads of their fiduciary duty--good faith, loyalty or due care. <u>Id</u>. If a litigant fails to meet this evidentiary burden, the business judgment rule attaches to protect

corporate officers and directors and the decisions that they make. The courts will not second-guess these business judgments. Id. If the presumption of the rule is rebutted, however, the burden shifts to the corporate officer, the proponent of the challenged transaction, to prove to the trier of fact the "entire fairness" of the transaction. Id. (quoting Nixon v. Blackwell, 626 A.2d 1366, 1376 (Del.Supr. 1993)). Under the "entire fairness" standard of judicial review, the corporate officers must establish to the court's satisfaction that the transaction was the product of both fair dealing and fair price. Id.

In this case, the defendants have provided sufficient evidence in the record to establish a genuine dispute of material fact that Gunter breached the triad of loyalty under Delaware law. To establish a breach of duty of loyalty, defendants must present evidence that the corporate officer either was on both sides of the transaction or "derive[d] any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." Id. at 363 (citing Aronson v. Lewis, 473 A.2d 805, 812 (1984)). It is undisputed in this case that Gunter signed the SEBA in two places, in one place on behalf of the USA, Inc. and in another place on behalf of himself as an employee of USA, Inc. and beneficiary of the SEBA. In addition, the undisputed evidence in the record establishes that the SEBA bestowed upon Gunter personal compensation and benefits. The evidence in the record also establishes that Gunter engaged in a transaction that completely benefitted him, to the complete detriment of the corporation and the sole shareholder.

Under Delaware law, however, a self-dealing transaction by corporate officer or director is not strictly prohibited. Instead, Delaware law provides specific procedures that may be employed by a corporate officer or director to remove the taint that any such transaction may possess. See Delta Star, Inc. v. Patton, 76 F.Supp.2d 617, 633 (W.D.Pa. 1999)(applying Delaware law). To

remove the taint of a self-dealing transaction, a corporate officer or director must establish to an independent body, whether it be a court in litigation, an independent committee of the board of directors, or a group of disinterested ratifying shareholders on full and complete information, that the transaction in question was fully fair and in the best interests of the corporation as a whole. Id.

In this case, Gunter has not presented a scintilla of evidence to establish that the SEBA was fair or that the SEBA was in the best interests of the corporation. Gunter's arguments surrounding the SEBA focus solely on how Gunter in executing and carrying out USA, Inc.'s obligations under the SEBA left a sufficient paper trail such that Novopharm, Ltd., and Dan should have know about the existence of the SEBA. These arguments presented by Gunter are without merit as to the issue of fairness and Gunter fails to remove the taint of impropriety surrounding the SEBA. Accordingly, taking all reasonable inferences in favor of Gunter, summary judgment as to Gunter's breach of fiduciary duty in favor of the defendants is necessary as a matter of law, defendants' having established by a preponderance of the evidence that Gunter engaged in self-dealing in executing the SEBA and Gunter having produced no evidence to remove the taint of impropriety.

B.    <u>Damages</u>

Having established as a matter of a law that Gunter breached his fiduciary duty owed to USA, Inc., Novopharm, Ltd., and Dan,  the traditional measure of damages is an award of compensatory damages, the actual loss caused by Gunter's wrongful conduct. <u>See</u> <u>Strassburger v. Earley</u>, 752 A.2d 557, 579 (Del.Ch. 2000).  Compensatory damages are measured by the "out-of-pocket" or actual loss.  For example, where a merger is found to have been effected at an unfairly low price, the shareholders are normally entitled to out-of-pocket (i.e., compensatory) money damages equal to the "fair" or "intrinsic" value of their stock at the time of the merger, less the price per share that they

actually received. Id.

In this case, there is insufficient evidence in the record to establish the out of pocket expenses of the defendants' as a result of Gunter's breach of his fiduciary duty. Such out of pocket expenses includes, but are not limited to, the costs of rescinding the SEBA, the premium costs of insurance policies Gunter executed pursuant to the SEBA, any other expenditures Gunter executed in connection with the SEBA, and the fees and costs in connection with this litigation. Accordingly, this court orders counsel for both sides to confer in order to assist the parties to reach an agreement as to the appropriate amount of compensatory damages to be awarded to the defendants consistent with this opinion.

VI. Prima Facie case of Fraud under Illinois Law

To establish a prima facie case of fraud and to survive a motion for summary judgment, a party must establish a knowingly misstatement of material fact, which is reasonably relied upon. Farm Credit Bank of St. Louis v. Isringhausen, 210 Ill.App.3d 724, 732, 569 N.E.2d 235, (4th Dist. 1991). To constitute fraud, the concealment may not be a mere passive omission of facts during a business transaction but must have been done with the intent to deceive under circumstances creating an opportunity and duty to speak. Id.

In this case, the undisputed evidence establishes the Gunter had a duty to disclose to information to Dan that concerned "all executed major business documents" of USA, Inc. However, USA, Inc. fails to produce sufficient evidence in the record to establish the requisite intent of Gunter to deceive. There exists in Count II of the counterclaim, among other issues of material fact, a genuine issue of material fact as to whether Gunter actively sought to conceal the execution of the SEBA and whether Gunter specifically lied about the existence of the SEBA. Therefore, summary

judgment on this count in favor of the defendants cannot be granted.

## CONCLUSION

For the above stated reasons, the defendants' motions for summary judgment are GRANTED as to the second amended complaint in its entirety and GRANTED as to the issue of liability in Count I of defendants' counterclaim. Defendants' motions for summary judgment are DENIED as to the issue of damages in Count I of defendants' counterclaim and DENIED as to Count II of defendants' counterclaim in its entirety. The issues of damages in Count I of the counterclaim and Count II of the counterclaim in its entirety will proceed to trial on the date previously scheduled.

The court urges counsel and the parties to confer in an attempt to reach an agreement and settlement in this litigation. The status of the settlement shall be reported at 9:00 a.m. on March 8, 2001. All other pending motions are moot. All other previously scheduled dates remain.

ENTER:

*James F. Holderman*

JAMES F. HOLDERMAN
United States District Judge

DATE: February 27, 2001